## UNITED STATES BANKRUPTCY COURT
### EASTERN DISTRICT OF KENTUCKY
### LONDON DIVISION

IN RE

**CHARLES FREDERICK McWHORTER**                                 **CASE NO. 14-61389**

**DEBTOR**

**SAMUEL K. CROCKER,**                                               **PLAINTIFF**
**UNITED STATES TRUSTEE**

**v.**                                                         **ADV. NO. 15-6038**

**CHARLES FREDERICK McWHORTER**                                   **DEFENDANT**

### MEMORANDUM OPINION

The Complaint filed by the United States Trustee seeks denial of the Debtor's discharge

based on one or more of the following grounds:  Count 1 and Count 3 – fraudulent transfer

and/or concealment under § 727(a)(2); Count 2 – false oath(s) under § 727(a)(4); Count 4 –

failure to explain a loss or deficiency of assets (§ 727(a)(5)); and Count 5 – failure to maintain

records under § 727(a)(3).  [AP No. 1.][1]  A trial was held on August 17 and 23, 2016 [AP

Nos. 52 and 57], and the matter is submitted for decision.  The U.S. Trustee indicated at trial that

it would not pursue Count 5.  The U.S. Trustee carried its burden and is entitled to judgment at

least under Counts 1-3.  Therefore, the Debtor's discharge is denied.

## I.    FACTS.

The following facts are based on the Joint Stipulations of the United States Trustee and

Debtor [AP No. 44] and the testimony and evidence presented at trial.

---

[1] References to the docket in Debtor's main bankruptcy case (Case No. 14-61389) appear as [ECF No. __].
References to the docket in the adversary proceeding (Adv. No. 15-6038) appear as [AP No. __].

A.    **Background.**

Before filing for bankruptcy, the Debtor, Charles Frederick McWhorter, owned and

operated Clay Building Supply ("CBS") and several affiliated entities (CBS Kitchen and Bath,

CBS Rental Center, Sydney Transportation, and Mac's Management).  [AP No. 44.]  CBS and its

affiliates sold hardware and building materials at two retail locations.  The Debtor purchased

CBS from his father, Charlie McWhorter, in or around 2001.

The Debtor also invested or was a part owner in other business ventures, including:

Quality Management and McHack Investments (convenience stores), Wine-n-Equine

(horseracing), TMC, LLC and Gas City, Inc. (Wendy's franchise/gas station), Elite Petroleum

(bulk petroleum sales), Southern Builders (residential construction), Slabtown Properties

(garage), Vetix (veterinary supplements), and North Star Technology (cellular phone towers).

[*See generally* AP Nos. 34-23 and 34-24.]  The Debtor testified that he was primarily a passive

investor, with only a limited role in operation and management of these entities.

The Debtor testified that CBS and the affiliated entities suffered from a downturn in the

economy and increased competition.  Elite lost money due to unexpected increases in fuel prices,

which was confirmed by co-owner Scott Hacker.  These problems necessitated significant cash

infusions that came from several sources.

The U.S. Trustee produced a list of "special deposits" from the CBS accounting system

totaling $847,428.07 between March 16, 2011, and April 11, 2014.  [*See* AP No. 34-30.]  The

Debtor acknowledged that the majority of the special deposits were proceeds of unsecured loans

from his father, although he asserted without further proof that he contributed some of the funds.

The record includes two handwritten promissory notes made by the Debtor payable to his father,

the first in the original principal amount of $685,000.00 on January 4, 2014, with a 3% interest

2

rate and a maturity date of December 31, 2014 [AP No. 34-32], and the second in the original

principal amount of $250,000.00 on April 19, 2014, with a 3% interest rate and a maturity date

of April 19, 2015 [AP No. 34-33].

The Debtor also obtained financing for his businesses from Central Kentucky Federal

Savings Bank and Bluegrass Community Bank.  The U.S. Trustee introduced the Debtor's

financial statement presented to Central Kentucky Federal Savings Bank dated January 2, 2012.

The January 2012 financial statement was signed by the Debtor on January 10, 2012, and

showed a net worth in excess of $11 million.  [AP No. 34-23.]  The U.S. Trustee also introduced

the Debtor's financial statement presented to Bluegrass Community Bank dated March 1, 2013.

The March 2013 financial statement was signed by the Debtor on March 19, 2013, and showed a

net worth in excess of $7 million.  [AP No. 34-24.]  The Debtor acknowledged his signature on

the January 2012 financial statement and March 2013 financial statement, but testified that he

did not prepare them.

The March 2013 financial statement valued the Debtor's business ventures described

previously at more than $5 million.  [*See* AP No. 34-24.]  The Debtor also valued his residence

at $1.1 million and personal effects at $450,000.00.  [*See id.*]  The January 2012 financial

statement and March 2013 financial statement valued a motor home at $128,000.00 and other

personal vehicles at $175,000.00.  [*Id.; see also* AP No. 34-23.]

### B.        The Chapter 7 Bankruptcy.

The Debtor filed his Chapter 7 bankruptcy petition on November 25, 2014.  [AP

No. 34-1.]  The Debtor's Summary of Schedules showed Total Assets in the amount of

$415,525.31, including:  (1) Real Property - $272,000.00, and (2) Personal Property -

$143,525.31.  [ECF No. 1 at 6.]  The Debtor listed Total Liabilities of $6,328,485.93, including:

(1) Secured Claims - $410,000.00; (2) Unsecured Priority Claims - $137,884.33; and

(3) Unsecured Claims - $6,328,485.93.  [*Id.*]

The Debtor listed three personal vehicles on Schedule B of his bankruptcy petition, two

Cadillacs owned jointly with his wife and a 2005 Nissan Maxima.  [*Id.* at 12-13.]  Schedule D

described loans secured by the Cadillacs that exceeded the values listed on Schedule B.  [*See id.*

at 16-17.]  The Debtor exempted the full value of the Nissan on Schedule C.  [*See id.* at 15.]

The debtor listed his residence as 197 McKenzie Lane, London, Kentucky, on

Schedule A, indicating it was worth $544,000.  [AP No. 34-1 at 4.]  Schedule A claims "joint

ownership with right of survivorship" with the Debtor's spouse, making his one-half interest

worth $272,000.00.  [*Id.*]  The Debtor estimated that the property was encumbered by secured

claims in the approximate amount of $150,000.00, suggesting that he held some equity in the

property.

Based on his initial assessment of the information in the Debtor's Petition and Schedules,

the Chapter 7 Trustee, James Westenhoefer, testified that the only property he viewed as likely

available to creditors was the Debtor's non-exempt equity in his home.  Westenhoefer did not

expect much, if any, value from the closely held businesses because such assets are usually hard

to sell for any significant value.

C.     **The Debtor's Pretrial Testimony.**

The Debtor testified under oath on multiple occasions prior to trial, including:  (1) a

§ 341 Meeting of Creditors on January 16, 2015, in Corbin, Kentucky [AP No. 34-41] (the

"Initial § 341 Meeting"); (2) a continued § 341 Meeting of Creditors on March 23, 2015, in

Lexington, Kentucky [AP No. 56-1] (the "Continued § 341 Meeting"); (3) a Rule 2004

Examination by the U.S. Trustee on October 27, 2015 [AP No. 34-43] (the "2004 Examination");

4

and (4) a discovery deposition in this adversary proceeding on April 20, 2016 [AP No. 34-44]

(the "Trial Deposition").  The Debtor was cross-examined at trial regarding conflicting testimony

at these events.

The Debtor testified that his petition and schedules were accurate to the best of his

knowledge at the Initial § 341 Meeting.  [AP No. 34-41 at 5-6.]  The Debtor confirmed delivery

of the January 2012 financial statement to Central Kentucky Federal Savings Bank and initially

testified to its accuracy, though he recanted that claim later in his testimony.  [*Id.* at 7-9, 13.]

The Debtor also acknowledged providing the 2013 financial statement to Bluegrass Community

Bank, but declined to vouch for its accuracy.  [*Id.* at 10-12.]  The Debtor also downplayed his

testimony from the Initial § 341 Meeting claiming he was "very sick" and distraught over his

bankruptcy filing.

At the Debtor's Continued § 341 Meeting two months later, the Debtor again admitted he

reviewed and signed the March 2013 financial statement submitted to Bluegrass Community

Bank.  [AP No. 56-1 at 43-44.]  The Debtor testified regarding the March 2013 financial

statement:  "Yeah, I believed it was accurate."  [*Id.*]

### D. The Debtor's Pre-Bankruptcy Vehicle Transfers.

The Chapter 7 Trustee testified that he visited the Debtor's residence in London,

Kentucky, on January 17, 2015, the day after the Initial § 341 Meeting.  While at the home, the

Trustee observed a 1998 Newmar Mt. Aire motor home parked in the Debtor's garage that was

not listed on Schedule B.  The Trustee also observed a black GMC Sierra Truck on the property

that was similarly unscheduled.  The Trustee testified that he spoke to the Debtor extensively

during the visit, but the Debtor did not disclose any vehicle transfers.

The unscheduled vehicles prompted the Trustee to review statewide title records to identify titled vehicles owned by the Debtor, the Debtor's wife, the Debtor's father, and Sydney Transportation, Inc., the entity that owned the GMC Sierra.  The Trustee identified five transfers of titled vehicles from the Debtor to his father in early October, 2014, the month preceding the bankruptcy:  (1) the 1998 Newmar Mt. Aire motor home [*see* AP No. 34-3]; (2) a 2000 Chevrolet Corvette [*see* AP No. 34-4]; (3) a 2004 Sea Ray boat [*see* AP No. 34-5]; (4) a boat trailer [*see* AP No. 34-6]; and (5) a 1983 Pontiac Firebird [*see* AP No. 34-7].  The Debtor and his father each identified their signatures on certified title documents for these vehicles presented at the trial.  [AP Nos. 34-3, 34-4, 34-5, 34-6, and 34-7.]

The Debtor and his father testified that the Corvette, motor home and boat and trailer were sold to the father in January 2013 for $60,000.00.  The Debtor produced a $60,000.00 check dated January 25, 2013, from the Debtor's father to the Debtor, but there was nothing that confirmed the check represented proceeds from the sale of the vehicles.  [AP No. 34-31 at 1.] The special deposits reflect a $60,000 contribution made by the Debtor to CBS on January 23, 2013, two days before the sale.  [AP No. 34-30; *see also* AP No. 34-31 at 2 (the corresponding check from the Debtor to CBS).]

The Debtor's father testified that he purchased the Pontiac for the Debtor while he was in college over twenty years ago.  He further testified that the Debtor was supposed to return the vehicle after finishing college, which is consistent with the father's agreements with other relatives.  Therefore, the transfer documents merely formalized his continuing ownership interest in the vehicle.  No party explained why the transfer did not occur until many years after the Debtor finished college.

Likewise, neither the Debtor nor his father explained why the titles to the Corvette, motor home and boat and trailer were not transferred until October 2014, more than 20 months after the alleged sale and just over a month before the petition date.  The Debtor and his father testified that Charlie McWhorter never used the motor home or boat after the alleged sale in January 2013.  The Debtor also could not explain why he purchased RV parking passes for the 2013 ($575), 2014 ($575) and 2015 ($800) University of Kentucky football seasons despite having allegedly sold the motor home prior to the deadline to purchase the tickets for the 2013 Fall season.  The Debtor's father also denied ever paying storage fees for the boat, which was stored at a local marina after the alleged purchase.

The U.S. Trustee introduced evidence that showed the Debtor and his wife maintained insurance coverage on the vehicles after the sale to the Debtor's father, although the Debtor denied any personal knowledge because his wife handles all household finances.  Patricia McWhorter, the Debtor's wife, confirmed her role as the manager of household finances, including the purchase of motor vehicle insurance.  She testified it was her practice to periodically review coverage to keep rates down.  Still, insurance premiums on the motor home and boat were paid until lapses in coverage occurred with respect to the motor home on May 1, 2013 [AP No. 34-8], and the boat on January 12, 2015 (last payment June 19, 2014) [AP No. 34-10].  The McWhorters maintained insurance coverage on the Corvette until Mrs. McWhorter removed the vehicle from the policy on October 9, 2014, the day after the Debtor executed the title transfer documents.  [AP No. 34-9.]

The Chapter 7 Trustee filed an adversary proceeding against the Debtor's father on August 6, 2015, seeking to recover the transferred vehicles for the benefit of the bankruptcy estate.  [*See* Adv. No. 15-6023, ECF No. 1.]  Charlie McWhorter eventually relinquished his

7

interest in the transferred vehicles pursuant to an Agreed Order.  [Adv. No. 15-6023, ECF

No. 20.]  Charlie McWhorter purchased the vehicles at a December 17, 2015 bankruptcy auction

for a total purchase price of $56,500.00 (Motor Home - $21,000.00; Corvette - $14,000.00; Sea

Ray Boat & Trailer - $18,000.00; and Pontiac - $3,500.00).  [AP No. 44.]

    In addition to the vehicles transferred to his father in October 2014, the Trustee also

identified a 2006 Lincoln Mark LT, titled jointly to the Debtor and his wife until September

2014.  [AP No. 44.]  The Lincoln was used to obtain trade-in credit for the purchase of a 2014

Chevrolet Malibu, which was subsequently titled in the name of Patricia McWhorter alone.  [*See*

AP Nos. 34-15 and 44].  Both vehicles were driven primarily by the Debtor's son, who is a

college student.  Mrs. McWhorter explained that the Malibu was titled in her name for insurance

purposes, but offered no explanation for the Debtor's omission from the title.

    The Debtor denied involvement in the purchase transaction at trial and disclaimed any

knowledge regarding record ownership of the Lincoln or Malibu.  The Debtor's father testified

that on September 16, 2014, he helped his grandson negotiate the trade-in and provided the

additional funds needed to purchase the Malibu.  [*See also* AP No. 34-15.]  The Debtor's father

explained that it was his custom to purchase vehicles for his grandchildren.  He further explained

that he had previously provided his grandson with a Chevrolet Avalanche that was later

transferred for trade-in credit toward the purchase of the Lincoln.  Mrs. McWhorter confirmed

this testimony, but added that she and the Debtor had financed an excess balance when the

Lincoln was purchased.  It is not clear who made car payments on the Lincoln, but $2,175.50

was applied to pay off a loan balance owed to U.S. Bank at the time of the trade-in.  [*See* AP

No. 34-15 at 1-2.]

E.      **The Debtor's Residence.**

The Debtor responded to the Trustee's request for a copy of the deed to his residence by providing a copy of a Quit Claim Deed dated June 20, 2005, from Harold Burchell Clark to the Debtor and his wife.  [*See* AP No. 34-21.]  The Quit Claim Deed was required because the chain of title suggested the prior conveyances might not have transferred all right, title and interest in the residence.[2]  [AP No. 36-11.]  The Trustee subsequently discovered, however, that the Debtor had failed to provide a copy of the original Deed of Conveyance dated May 17, 2003, from the Debtor's parents to him, as a married man.  [AP No. 34-22.]  The Deed of Conveyance did not transfer any interest to the Debtor's wife.  Therefore, the Trustee believed the Debtor's wife only had a one-twelfth interest in the residence.  [*See* AP No. 36-11.]

The Chapter 7 Trustee initiated an adversary proceeding to sell the Debtor's residence free and clear of liens pursuant to 11 U.S.C. § 363.  [Adv. No. 15-6024, ECF No. 1.]  In addition to her nominal legal interest, the Debtor's wife asserted an equitable interest in the residence because the source of funds to acquire the Debtor's residence came from the sale of a prior home that was owned jointly by the Debtor and his wife.  [Adv. No. 15-6024, ECF No. 13; *see also* AP No. 36-15 – Trustee's Motion to Approve Compromise and Settlement of Controversy filed in the Debtor's main bankruptcy case].  Patricia McWhorter settled the adversary proceeding by agreeing to purchase the bankruptcy estate's interest in the residence for $150,000.00.  [Adv. No. 15-6024, ECF No. 21; AP No. 36-15.]

---

[2] Additional information regarding the chain of title and Patricia McWhorter's potential interest in the property is set forth in a September 16, 2015, letter from the attorney for the Chapter 7 Trustee to the attorneys for the Debtor and his wife.  [AP No. 36-11.]

F.      **The Denial-of-Discharge Trial.**

The trial was held on August 17 and 23, 2016, and an order summarizing the admitted

Exhibits was entered at its conclusion.  [AP No. 60.]  The facts and opinions presented at the trial

are addressed in this Opinion.

The Chapter 7 Trustee testified regarding other assets of the Debtor that were not initially

disclosed.  The Trustee noted that the Debtor failed to divulge his ownership of four season

tickets for the University of Kentucky men's basketball team for the 2014-15 season.  At the

time of filing, 15 of 21 home games remained on the team's schedule.  [*See* AP No. 34-20.]

Face price for the four complete sets of tickets, not including the Debtor's donation pledge,

totaled $3,570.00.  [*See* AP No. 34-19.]

The Trustee testified, consistent with his Final Report [ECF No. 165], that he

administered eleven specific assets in the case (twelve if the boat and trailer are counted

separately).  Those assets included the six vehicles owned by Sydney Transportation, the four

vehicles transferred to the Debtor's father in October 2014, and the Trustee's settlement of the

adversary proceeding to liquidate the Debtor's equity in his residence.  [*Id.*]  Together, the sale

of those assets generated gross proceeds for the estate of $262,000.00.  [*Id.*]  According to the

Trustee, the Debtor failed to disclose, concealed or otherwise omitted information from his

bankruptcy petition with respect to each of these assets.  [*See id.* (designating these assets as

"Unscheduled Property").]

II.     **JURISDICTION.**

This action concerning an objection to discharge is a core proceeding under 28 U.S.C.

§ 157(b)(2)(J).  The Court has jurisdiction of core proceedings pursuant to 28 U.S.C. §§ 157(a)

and 1334, and Joint Local Rule 83.12 of the United States District Courts for the Eastern and

Western Districts of Kentucky.  Venue is proper pursuant to 28 U.S.C. § 1409.

## III.   ANALYSIS.

### A.   Section 727 and the Burden of Proof.

#### 1.   Elements of a § 727(a) Claim and Burden-Shifting Analysis.

The U.S. Trustee seeks denial of the Debtor's discharge based on any of the following

provisions of § 727:

> **(a)** The court shall grant the debtor a discharge, unless--
>
> . . .
>
> **(2)** the debtor, with intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, destroyed, mutilated, or concealed--
>
>> **(A)** property of the debtor, within one year before the date of the filing of the petition; or
>>
>> **(B)** property of the estate, after the date of the filing of the petition;
>
> . . .
>
> **(4)** the debtor knowingly and fraudulently, in or in connection with the case--
>
>> **(A)** made a false oath or account;
>>
>> . . .
>
> **(5)** the debtor has failed to explain satisfactorily, before determination of denial of discharge under this paragraph, any loss of assets or deficiency of assets to meet the debtor's liabilities;

11 U.S.C. § 727.

"The elements of a violation of 11 U.S.C. § 727 must be proven by a preponderance of

the evidence to merit denial of discharge."  *Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 683

(6th Cir. 2000).  "An action to deny the debtor a discharge is to be construed liberally in favor of

the debtor and strictly against the party seeking denial of discharge."  *McDermott v. St. George*

*(In re St. George)*, Case No. 14-16075, Adv. No. 15-1063, 2016 WL 2603367, at *9 (Bankr.

N.D. Ohio May 3, 2016) (citing to *Keeney*, 227 F.3d at 683).  But "a discharge is a privilege and

not a right and should inure only to the honest but unfortunate debtor."  *U.S. Tr. v. Varner (In re*

*Varner)*, Case No. 14-61103, Adv. No. 14-6021, 2015 WL 4039390, at *4 (Bankr. N.D. Ohio

June 30, 2015).

Courts employ a burden-shifting analysis to evaluate claims for denial of discharge under

§ 727.  *See, e.g., Varner*, 2015 WL 4039390, *4 (applying burden-shifting approach for U.S.

Trustee claims for denial of discharge under §§ 727(a)(2) and 727(a)(4)); *Crocker v. Stiff (In re*

*Stiff)*, 512 B.R. 893, 900 (Bankr. E.D. Ky. 2014) (applying burden-shifting approach to claim

based on loss of assets under § 727(a)(5)).  Thus, if the U.S. Trustee provides sufficient evidence

to prove a prima-facie case, the burden shifts to the Debtor to rebut the claim and justify his

actions.  *Varner*, 2015 WL 4039390, *4.  Discharge is denied if the Debtor cannot adequately

rebut the U.S. Trustee's claim.  *Id.*

### 2.    Proving Fraudulent Intent.

A key element of the proof required for §§ 727(a)(2) and (4) claims is a determination

that the Debtor acted with a fraudulent intent to conceal the transfers and make false statements

or omissions.  "[T]he standard necessary to support a finding of knowingly making a false

statement with the intent to defraud is, for all practicable purposes, identical to the standard

required to support a finding of fraudulent intent under § 727(a)(2)."  *C & H Elec. v. Newell (In*

*re Newell)*, 321 B.R. 885, 892 (Bankr. N.D. Ohio 2005); *but see Varner*, 2015 WL 4039390 at

*13 (acknowledging similarity but highlighting "subtle differences" between fraudulent intent to

make false oath as opposed to a transfer or concealment).  As noted by the Sixth Circuit, "Courts

may deduce fraudulent intent from all the facts and circumstances of a case." *Keeney*, 227 F.3d at 686 (internal quotation omitted).

A debtor almost never admits he acted with fraudulent intent, so courts look at circumstantial evidence and the overall pattern of conduct to determine the debtor's subjective intent. *See, e.g., Varner*, 2015 WL 4039390, *6. Credibility is also a significant factor when evaluating fraudulent intent. *See, e.g., id.* These factors are discussed when evaluating each area of concealment, false statements or omissions.

### B.  Denial of the Debtor's Discharge is justified under either § 727(a)(2) or § 727(a)(4) – Counts 1-3.

The fraudulent transfer and concealment claims under § 727(a)(2) and the false oath allegations under § 727(a)(4) both involve related facts and require proof of fraudulent intent. The U.S. Trustee asserts that the Debtor fraudulently concealed the existence of numerous assets, including all unencumbered vehicles. The U.S. Trustee also believes the failure to disclose the true ownership of the residence was an attempt to conceal equity in the home. The U.S. Trustee carried its burden and the Debtor's proof was not sufficient to explain the problems.

### 1.  Count 1 and Count 3 – Fraudulent Transfer & Concealment (§ 727(a)(2)).

The purpose of § 727(a)(2) "is to prevent the discharge of a debtor who attempts to avert collection of his debts by concealing or otherwise disposing of assets." *Nat'l City Bank v. McNamara (In re McNamara)*, 89 B.R. 648, 650 (Bankr. N.D. Ohio 1988) (internal citation omitted). The U.S. Trustee must prove the following four elements to support a prima-facie case under § 727(a)(2):

(1)  the disposition of property, such as a transfer or concealment,

(2)    a subjective intent on the debtor's part to hinder, delay, or defraud a
       creditor through the act of disposing of the property,

(3)    the property is owned by the debtor, and

(4)    the disposition occurred within one year of the petition date.

*McDermott v. Recupero (In re Recupero)*, Case No. 13-60322, Adv. No.  13-6089, 2014 WL

1884331, at *6 (Bankr. N.D. Ohio May 12, 2014).

### a.  The Corvette, Motor Home and Boat and Trailer.

The Debtor only scheduled three vehicles, which were either fully encumbered or

exempt.  The Debtor did not identify the Corvette, motor home or boat and trailer on Schedule B

because he claims they were sold to his father in January 2013 for $60,000.00.  [*See* AP 34-30.]

But the U.S. Trustee provided certified copies of Certificates of Title and transfer documents that

show the transfer papers were not executed until October 2014.  [AP 34-3-6.]  The title

information is strong evidence that the transfers did not occur until October 2014, just over a

month before the petition date.

"Kentucky is a title ownership state and has enacted a comprehensive statutory scheme

governing the transfer of motor vehicles."  *Peacock v. Damon Corp.*, 458 F. Supp. 2d 411, 414

(W.D. Ky. 2006).  Under Kentucky law:  "If an owner transfers his interest in a vehicle, he shall,

at the time of the delivery of the vehicle, execute an assignment and warranty of title to the

transferee in the space provided therefor on the certificate of title . . . ."  KY. REV. STAT.

§ 186A.215(1).  Kentucky allows a new owner 15 days to "apply for and obtain a certificate of

title in his name."  KY. REV. STAT. § 186A.070(1).

The only evidence to corroborate the Debtor's and his father's claims that the Corvette,

motor home and boat and trailer were actually sold in January 2013 is the $60,000.00 check from

the Debtor's father dated January 25, 2013.  But nothing on the check indicates it represented

money for the sale of vehicles and the Debtor could not produce a loan or other documentation to

suggest the check represented sale proceeds.  Further, the check was just one in a series of

payments from the Debtor's father, all of which were otherwise described as unsecured loans.

Other evidence supports the U.S. Trustee's allegations.  Neither the Debtor nor his father

could provide an explanation for the delay of almost 22 months between the alleged sale date and

the execution of the title documentation.  Further, the Debtor's previously provided inconsistent

testimony regarding the alleged sale, which harms his credibility.  The Debtor testified at the

Continued § 341 Meeting in March 2015 that the $60,000.00 check from his father "was for the

motor home and the corvette" [AP No. 56-1 at 110-11] and denied the boat and trailer were

included in the $60,000.00 payment [*id.* at 126-27].

The Debtor also failed to disclose transfer of these assets on his Statement of Financial

Affairs.  Section 10 of the Statement of Financial Affairs, titled "Other Transfers," requires

disclosure of "property, other than property transferred in the ordinary course of the business or

financial affairs of the debtor, transferred either absolutely or as security within **two years**

immediately preceding the commencement of this case."  [AP No. 34-1 at 15 (emphasis in

original).]  Sale of the Corvette, motor home and boat and trailer clearly satisfy this requirement,

but the Debtor answered "None."  [*Id.* at 15.]

The Debtor demonstrated his continued ownership of the assets by paying incidental

costs of ownership, and maintaining possession, of the vehicles beyond January 2013.  The

Debtor's wife admitted she continued to make payments on insurance well after the alleged

January 2013 sale date, including payment of the premium for the boat insurance in June 2014.

Insurance for the Corvette was only terminated on October 9, 2014, one day after the Debtor

executed the paperwork to transfer title.  Termination of the Corvette insurance one day after the

title transfer documents were executed supports the U.S. Trustee's assertion that the transfer did

not occur until October 2014.  Also, it is not reasonable to believe the Debtor, facing severe

financial problems, would fail to tell his wife she should terminate the insurance policies and

recover any available premiums if the transfer really occurred in January 2013.  Also,.

Despite allegedly selling the motor home to his father, it remained in the Debtor's garage

and his father never used it after January 2013.  Further, the Debtor continued to purchase RV

parking passes for the University of Kentucky's home football games for the 2013, 2014 and

2015 seasons after the alleged sale occurred.  The boat and trailer remained in storage and were

also never used by the Debtor's father and the Corvette was stored at the Debtor's CBS store or

garage and was not driven by the Debtor's father.

Finally, the Debtor continued to represent himself as the owner of the vehicles in his

March 2013 financial statement, which was dated and provided to the bank almost two months

after the alleged sales.  All of these facts show the Debtor continued to own the Corvette, motor

home and boat and trailer after January 2013, making it easy to conclude the transfers did not

occur until the title documents were executed.  The Debtor's proof does not refute this

conclusion.

### b.  The Pontiac Firebird.

The U.S. Trustee also provided a certified copy of the Certificate of Title and transfer

documents for the Pontiac that show the Debtor transferred the car to his father in October 2014.

The Debtor's father explained that he purchased the vehicle for the Debtor to use in college, but

it was always intended that the Debtor would return it.  The timing of the transfer, just over a

month before the bankruptcy, and over 20 years after the Debtor was out of school, is sufficient

16

to show a subjective intent to interfere with the Trustee's legitimate effort to liquidate assets of the Debtor's estate and conceal the transfer.

The execution of the title documents for the Pontiac twenty years later also support the conclusion that the Debtor was attempting to conceal the other assets transferred at the same time – the Corvette, motor home and boat and trailer.  [*See supra* at Section III.B.1.a.]

### c.   The Lincoln Mark LT.

The U.S. Trustee proved, and the Debtor admitted, that the Debtor and his wife owned the Lincoln Mark LT that was transferred to a dealership for trade-in credit on the Chevrolet Malibu approximately two months before the bankruptcy petition.  The Debtor's father testified that he took his grandson (the Debtor's and his wife's son) to shop for a new car because the Lincoln used too much gas getting back and forth to college.  The Debtor's wife and father both said the Lincoln was acquired when they traded in a prior vehicle that was also a gift from the Debtor's father.

The Debtor testified he was only listed as an owner of the Lincoln for insurance purposes. But the Debtor, his wife and his father did not explain why the Debtor was not listed on the title for the replacement vehicle.  Also, the Debtor's wife testified that she and her husband financed a balance owed on the Lincoln when it was acquired, which undercuts the Debtor's argument that any equity in the vehicle essentially belonged to his father.

It is hard to accept the Debtor's claim that he was wholly unaware of the Lincoln's transfer.  It is highly likely a father would know the type of vehicle his son drives from the Debtor father's home to school and back.  Even if he did not know, the Debtor would have signed title transfer documents similar to those described for the other vehicles when the Lincoln

17

was sold.  The transaction occurred in September 2014, too close in time to the petition date and

other vehicle transfers to justify a complete lack of knowledge.

The weight of this evidence favors the Trustee and it is more probable than not that the

debtor intended to conceal this transfer.

### d.  The Residence.

The Trustee also argues the Debtor's failure to disclose the original Deed of Conveyance

for his residence was just another example of the Debtor's efforts to hide assets.  The Debtor did

not provide the original Deed of Conveyance to the Trustee, only a Quit Claim Deed that fixed

problems with earlier conveyances.  The Quit Claim Deed was transferred jointly to the Debtor

and his wife, but the Deed of Conveyance only conveyed the property to the Debtor.

The Debtor's failure to provide the original Deed of Conveyance to the Trustee in

isolation might reflect an inadvertent error.  The Debtor testified he did not understand the legal

ramifications of the deeds.  Also, the Debtor's wife was a joint owner of the property that was

sold to provide proceeds to acquire this residence.  Further, inclusion of the Debtor's wife as a

joint tenant on the corrective Quit Claim Deed executed only two years after the original Deed of

Conveyance suggests the original intent was to include her as a co-owner.

The problem is, however, that the preceding discussion regarding the vehicles reveals an

intentional scheme to transfer property on the eve of bankruptcy and conceal the transactions.

That makes the Debtor's failure to provide the original Deed of Conveyance look more like an

intentional act.

The Debtor attempted to argue the estate was not harmed.  The Trustee agreed the

transfer to the Debtor's wife was a fair settlement.  But a fair resolution was never certain and

the Debtor stood to avoid potentially costly litigation by giving the Trustee the false impression

that the residence was jointly owned.  Further, the fact that an estate is not harmed is not an

element of a § 727(a)(2) analysis.

Still, the Debtor's arguments and recognition that the transfers at issue occurred at least

ten years before the bankruptcy filing, when the Debtor's financial condition was healthy, are

just enough to give the Debtor the benefit of the doubt.

### e.  The Basketball Tickets and Other Undisclosed Assets.

The Debtor failed to disclose his ownership of four tickets for the University of Kentucky

2014-15 men's basketball season.  Face value for the four complete sets of tickets, not including

the Debtor's donation pledge, totaled $3,570.00.  [*See* AP No. 34-19.]  At the time of filing, 15

of 21 home games remained on the team's schedule.  [*See* AP No. 34-20.]

The Debtor argued that the schedule showing 15 games remaining was inadmissible.  He

also showed that the Trustee had never sold University of Kentucky basketball tickets and did

not know about possible restrictions on resale imposed by the University of Kentucky.  Despite

these issues, it is hard to accept an argument that four season tickets to the University of

Kentucky basketball games have no value in November, when the season has just begun, with or

without a team schedule in the record.

The Debtor also failed to disclose other assets, including a potential restitution award

involving a failed investment [*see* ECF No. 151; AP No. 34-40] and an interest in the Charles F.

McWhorter Family Trust [*see* AP No. 34-34].  The Debtor testified he forgot they existed

because they significantly pre-dated the bankruptcy filing and had no value.  The Trustee

confirmed he abandoned any claim regarding the failed investment and the proof showed the

trust is only an estate planning vehicle.

The Debtor had a duty to disclose these assets and the failure to do so represents more examples of the Debtor's intentional concealment. But the evidence already discussed regarding the transfer and concealment of other assets is enough to satisfy the U.S. Trustee's burden of proof. Therefore, the proof regarding the basketball tickets and other assets is not necessary because the burden of proof already shifted to the Debtor.

### f.   Sydney Transportation Vehicles.

The U.S. Trustee also wants an inference of fraud based on the failure to disclose the existence of vehicles owned by Sydney Transportation. Sydney Transportation is a wholly-owned asset of the Debtor with a value of $9,000.00 on Schedule B. The Chapter 7 Trustee ultimately sold six vehicles titled in the name of Sydney Transportation for $56,100.00 [AP No. 44], netting approximately $42,000.00 after paying related liens.

Schedule B did not require a breakdown of the assets of Sydney Transportation, so the failure to list them is not concealment. Further, it is not enough to rely solely on the existence of the vehicles when there is a possibility liabilities or other facts might justify the Debtor's estimate. Therefore, the U.S. Trustee did not carry its burden to show there was a fraudulent concealment regarding Sydney Transportation.

### g.   The U.S. Trustee Carried Its Burden of Proof Regarding the Elements of § 727(a)(2).

The U.S. Trustee identified several factors that weigh in favor of a finding of fraudulent intent, including: (i) transfers to a close family member; (ii) the Debtor's retention of possession, benefit or use of the property; (iii) the conveyance of all the Debtor's unencumbered, non-exempt property (excluding the residence); (iv) the secrecy of the conveyance; (v) the cumulative effect of a pattern of transactions or omissions by the Debtor; and (vi) the timing of

the transfers relative to the petition date. The proof confirms these badges of fraud exist and justify a conclusion that the Debtor's transfers and subsequent concealment were intentional. *See, e.g., Newell*, 321 B.R. at 889.

The U.S. Trustee carried his burden to prove the elements of a claim to deny the Debtor's discharge under § 727(a)(2). The Corvette, the motor home, the boat and trailer and the Pontiac were owned by the Debtor and transferred just over a month before the petition date. The Debtor concealed these transfers and the transfer of the Lincoln. The Debtor's actions, inconsistent testimony and inability to explain the long delay between the alleged sales and the actual record transfer of these vehicles all suggest a subjective intent to prevent the Trustee from administering these assets. The discussion of the Debtor's other actions or inactions in this Opinion overlap and all support this conclusion.

## 2.    Count 2 – False Oaths (§ 727(a)(4)).

The Debtor is not entitled to a discharge if he knowingly and fraudulently made a false oath or account. 11 U.S.C. § 727(a)(4); *see also Keeney*, 227 F.3d at 686 ("Complete financial disclosure is a prerequisite to the privilege of discharge." (Internal quotations and citation omitted)). The knowing omissions and concealment described in the proceeding discussion of the § 727(a)(2) claims also show the Debtor was not candid when he provided sworn testimony.

The U.S. Trustee contends that each of the following oaths, standing alone, is enough to deny the Debtor's discharge:

- statement on Schedule A that the residence was held as "joint ownership with right of survivorship" with the Debtor's wife and that the value of the property was $544,000.00;

- failure to disclose the pre-bankruptcy transfers of the Corvette, motor home, boat and trailer, Pontiac and Lincoln; and

- testimony at the Initial § 341 Meeting and the Continued § 341 Meeting, and at trial, that the Debtor's father purchased the Corvette, motor home and boat and trailer for $60,000.00 on January 23, 2013.

[AP No. 1 at 13.]

The Sixth Circuit outlined the elements necessary to prove a denial-of-discharge claim based on a debtor's false oaths in *Keeney*:

> In order to deny a debtor discharge under [§ 727(a)(4)(A)], a plaintiff must prove by a preponderance of the evidence that: 1) the debtor made a statement under oath; 2) the statement was false; 3) the debtor knew the statement was false; 4) the debtor made the statement with fraudulent intent; and 5) the statement related materially to the bankruptcy case.

227 F.3d at 685 (internal citation omitted).

The first element is easily satisfied. The Debtor signed his bankruptcy petition "under penalty of perjury," declaring the information it contained was "true and correct" on November 21, 2014. [AP No. 1 at 3.] Also, statements made during the Initial § 341 Meeting, the Continued § 341 Meeting, the 2004 Examination and the Trial Deposition all occurred when the Debtor was under oath and subject to penalty of perjury. [*See* AP No. 34-1, 34-41, 34-43, 34-56 and 56.] The remaining elements are discussed in connection with the alleged false oaths.

### a. Statements Regarding the Vehicles.

The Debtor admits that there were errors and omissions in the information provided with his bankruptcy petition regarding the vehicles. But the Debtor contends any errors during the Initial § 341 Meeting were the result of his illness and his feelings of distress regarding the need to file bankruptcy. The Debtor also points out he has since amended his Statement of Financial Affairs to provide notice of those transfers. [*See* ECF No. 151.]

But the amendment and the Debtor's admissions regarding the vehicles all occurred after the Trustee became aware of the transfers through his own independent investigations. Further,

the discussion addressing the § 727(a)(2) claims concludes the Debtor transferred the vehicles on the eve of bankruptcy to shield them from the Trustee.  It is an easy extension of these conclusions to determine the Debtor knowingly and intentionally made false statements and omissions to further that scheme.

The Debtor repeatedly professed ignorance regarding even basic management of his financial and business affairs to support his claims any errors were honest and inadvertent.  The evidence contradicts his claims and tends to show the Debtor was a sophisticated businessman.  The Debtor successfully owned and managed several operating companies for years and had investments in numerous other entities.  The Debtor was also a member of the Forcht Bank Board of Directors, a position he claims was only advisory and solely to generate mutual business.  But it is not credible to suggest the bank would nominate a person without the ability to fulfill the serious responsibilities of a member of the board of a national banking association.

An item that affected the impression of the Debtor's credibility was his failure to give a direct answer when his attorney asked him if he thought the petition was accurate when filed.  The Debtor first responded:  "The day was really hard, I don't remember that day."  When pressed as to whether he would have signed an inaccurate petition, the Debtor stated only, "I would have done my best."  Even when asked the leading, follow-up question – "So you believed you were accurate—to the best of your knowledge?" – the Debtor again avoided a direct answer, stating, "I wanted to be, yeah."

The Debtor's false oaths were clearly material in this case.  Materiality is a broad standard under Sixth Circuit precedent:  "The subject of a false oath is material if it bears a relationship to the bankrupt's business transactions or estate, or concerns the discovery of assets, business dealings, or the existence and disposition of his property."  *Keeney*, 227 F.3d at 686

(internal quotations and citation omitted).  The five vehicles sold were the Debtor's only

unencumbered, non-exempt assets other than the residence.  Further, the Debtor eventually sold

the vehicles for over $56,000 (approximately 25% of all distributions), a material amount.

The Debtor emphasized that his father paid the Trustee $53,000.00 for the vehicles

purchased at the December 17, 2015 bankruptcy sale, roughly equivalent to the $60,000.00 the

father allegedly paid in January 2013.  This argument assumes the validity of the earlier sale,

however, which the prior discussion discredits.  The proof shows the transfers did not occur until

October 14, 2014, and the testimony surrounding the purchase is inconsistent and self serving.

### b.  Statements Regarding Joint Ownership of the Residence.

A much closer question is whether the Debtor's erroneous description of his ownership

interest in his residence amounts to a fraudulent concealment or false oath.  The Debtor again

admitted errors and omissions were made in his bankruptcy petition.  It is also easy to conclude

the Debtor's assertion of "joint ownership" of the residence with his wife on Schedule A was

insufficient to put the Trustee or other parties on notice of the issues with the property's

ownership.

But, there is no proof the value was understated on Schedule A because the Trustee

settled for an amount that would justify the value placed on the residence by the Debtor.  Also,

consistent with analysis under § 727(a)(2), it is possible the Debtor believed his wife was a joint

owner based on the Quit Claim Deed and the long delay between the petition date and the earlier

deeds.  Therefore, the Debtor is entitled to the benefit of the doubt regarding his statements

involving his residence.

**3.      The U.S. Trustee Produced Ample Proof to Support Denial of
Discharge Under Either § 727(a)(2) or § 727(a)(4) that the Debtor
Failed to Explain or Rebut.**

The U.S. Trustee proved by a preponderance of the evidence each of the elements

required to support a denial of the Debtor's discharge based on fraudulent transfer or

concealment under § 727(a)(2) or false oath under § 727(a)(4) regarding the transfer of the

vehicles.  The burden then shifted to the Debtor, who failed to provide any reasonable

explanations for his pre-bankruptcy transactions or for the errors and omissions in his petition

and testimony.  Accordingly, denial of the Debtor's discharge is warranted under either

§ 727(a)(2) or § 727(a)(4).

**C.      The Debtor's Failure to Explain Loss or Deficiency of Assets Under
§ 727(a)(5)) Could Also Support Denial of Discharge.**

"[T]he plaintiff in a § 727(a)(5) action has the burden to identify assets which the debtor

at one time owned and claims, in his schedules, to no longer possess.  Once having met that

burden, the burden shifts to the debtor to offer a satisfactory explanation of the loss of assets."

*Stiff*, 512 B.R. at 900 (citing to *PNC Bank v. Buzzelli (In re Buzzelli)*, 246 B.R. 75, 116 (Bankr.

W.D. Pa. 2000)).  Unlike the U.S. Trustee's other § 727 claims, "noticeably lacking from

§ 727(a)(5) is any element of wrongful intent or, for that matter, any affirmative defenses –

§ 727(a)(5) simply imposes strict liability."  *Baker v. Reed (In re Reed)*, 310 B.R. 363, 368

(Bankr. N.D. Ohio 2004).

The U.S. Trustee argues denial of discharge under § 727(a)(5) is warranted because the

Debtor is unable to explain substantial declines between 2012 and the petition date.  The

Debtor's net worth had decreased $17 million since January 2012 (34 months) and $14 million

since March 2013 (19 months).  [AP Nos. 34-23 and 34-24.]  Also, the March 2013 financial

statement lists assets of $10,580,820.00, but the November 25, 2014 bankruptcy petition

identifies just $415,525.31 in total assets.  [ECF No. 1 at 6.]  These changes are material and it is

reasonable to require an explanation.

The Debtor argues that the U.S. Trustee failed to carry its burden on this count because it

did not come forward with proof that the information in the financial statements was accurate.

The Debtor testified that he did not review the financial statements and does not even know who

prepared either document.  The Debtor also provided undisputed testimony regarding the

financial troubles facing CBS and Elite, which caused severe cash-flow problems that would

have depleted his liquid assets.  Further the difference in the values of the closely held businesses

is understandable because such assets often have more value in the hands of a debtor than in

possession of a bankruptcy trustee for liquidation.

These arguments could justify some of the decrease in value reflected in the financial

statements, but other questions remain unanswered.  The Debtor's high estimates for the value of

his residence ($1,100,000.00),[3] the motor home ($128,000.00) and the vehicles ($175,000.00) in

the March 2013 financial statement are troubling.  The values are so far off the actual values

proven by the Trustee's liquidation sales that it is reasonable to conclude the Debtor presented

false financial statements.  That is not a positive conclusion for the Debtor because of the affect

on the parties that relied thereon.

Despite the U.S. Trustee's concession that testimony by the Debtor under oath that the

2013 financial statement was fraudulent would likely defeat the § 727(a)(5) claim [*see* AP

No. 51 at 2-3], the Debtor never admitted that he knew the financial statements were inaccurate

---

[3] The value of the residence might be even more if two other assets listed on the 2013 financial statement are
considered part of the property:  (1) Two Lots at Quail Chase - $75,000.00; and (2) Garage and Lot - $200,000.00.
[AP No. 34-24.]

at the time he submitted them.  To the contrary, the Debtor testified at the Continued § 341

Meeting  that he reviewed and signed the March 2013 financial statement and believed it was

accurate at the time he gave it to Bluegrass Community Bank.  [AP No. 56-1 at 43-44.]

The Debtor has consistently sought to cast doubt on the accuracy and reliability of the

2013 financial statement, testifying at trial that it was prepared by "an array of people" and

attributing errors in the information it contained to those unnamed employees.  Contrary to the

Debtor's promise on the stand, no future witness provided information on the preparation of the

financial statements.  These conflicting and incomplete arguments significantly undermine the

Debtor's arguments.

There are other items on the financial statements that also suggest the need for additional

scrutiny.  For example, the Debtor valued his personal effects at $450,000.00 on his 2013

financial statement, but similar items were listed at just $13,750.00 in his bankruptcy petition.

Ultimately, however, it is not necessary to rely on the § 727(a)(5) claim to deny discharge

because it was already determined that denial of the Debtor's discharge is warranted under either

§ 727(a)(2) or § 727(a)(4).

Even though not relied on to deny discharge, the discussion regarding § 727(a)(5) has

value to this Opinion because it supports the conclusions regarding the §§ 727(a)(2) and

727(a)(4) claims.  This discussion also highlights the Debtor's inconsistent testimony and

credibility issues affecting his arguments.  The review confirms the determination the Debtor

was acting to further a scheme to protect his assets from the Trustee and his bankruptcy estate.

## IV.   <u>CONCLUSION.</u>

The foregoing constitutes the Court's findings of fact and conclusions of law.  In

reaching the conclusions found herein, the Court has considered all of the evidence, exhibits, and

arguments of counsel, regardless of whether or not they are specifically referred to in this

decision. A separate Order shall be entered accordingly.

The affixing of this Court's electronic seal below is proof this document has been signed by the Judge and
electronically entered by the Clerk in the official record of this case.



Signed By:
*Gregory R. Schaaf*
Bankruptcy Judge
Dated: Wednesday, September 14, 2016
(grs)